SUPERIOR COURT 
 
 SAMUEL D. PERRY Plaintiff, vs. PATRICK J. GLYNN, et al., Defendants

 
 Docket:
 2014-04016-H
 
 
 Dates:
 December 2019
 
 
 Present:
 Robert L. Ullmann Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 FINDINGS OF FACT, RULINGS OF LAW, AND ORDER
 
 

 Introduction
 The structures of Boston's Back Bay neighborhood stand on untold thousands of wooden piles, hardwood shaped like short telephone poles. Trinity Church alone has 4,500 such piles as support. Unlike above-ground telephone poles, these piles require immersion in water to be properly preserved; they deteriorate when exposed to air.
 Decades of building construction and road paving deprived the Back Bay's piles of rainwater that would otherwise have seeped into the soil. In response, in 2006, the City of Boston created a Groundwater Conservation Overlay District ("GCOD") covering much of the Back Bay, codified at Boston Zoning Code Article 32 ("Article 32"). The purposes of the article were to "(a) prevent the deterioration of and, where necessary, promote the restoration of, groundwater levels in the city of Boston; (b) protect and enhance the city's historic neighborhoods and structures and otherwise conserve the value of its land and buildings; (c) reduce surface water runoff and water pollution; and (d) maintain public safety." Article 32, § 32-1.
 -1-
 Pursuant to Article 32, no significant construction or restoration project within the GCOD can proceed without a conditional use permit ("CUP"), which is issued by the Boston Zoning Board of Appeals ("ZBA") after a hearing. Id., §32-4 and 32-5. To obtain a CUP, the applicant must satisfy three requirements, subject to limitations not relevant in this case. First, the property owner must present plans for an appropriately designed, i.e., properly engineered, rainwater infiltration system that will allow rainwater to seep into the soil.[1] Id., §32-6(a). Second, the rainwater infiltration system must be capable of catching sufficient rainwater based on the surface area of the land on which the proposed project will be constructed.[2] Id. Third, the proposed project must result in no negative impact on groundwater levels on the project site or adjacent lots. Id. §326(b).
 The plaintiff, Samuel D. Perry ("Perry"), challenges ZBA's issuance of a CUP to the defendant, Patrick J. Glynn ("Glynn"), in September 2014 for a building restoration and refurbishment project (the "Proposed Project") on land adjacent to land that Perry has owned for many years (the "Perry Property"). While Perry makes numerous arguments, his most substantive argument in this Court's view is based on ZBA's interpretation of Article 32 that a suitably designed stormwater infiltration system that captures sufficient rainwater based on the surface area of the project site is presumed to cause no negative impact on groundwater levels on the project site lot or adjacent lots. Another way of saying this is that, by satisfying the two conditions of Article §32-6(a), the applicant is presumed to have satisfied the condition of Article §32-6(b). Based on the below
---------------------------
 
[1] This opinion uses the terms "rainwater infiltration system" and "stormwater infiltration system" interchangeably.
[2] The system must also capture sufficient rainwater once built, but this cannot be assessed at the time of the ZBA hearing.
 -2-
Findings of Fact and the applicable law, this Court concludes that, at least under the circumstances of this case, ZBA's interpretation of Article 32, §32-6 is the most reasonable interpretation of that provision. Therefore, the CUP for the Proposed Project was properly issued and ZBA's decision to issue a CUP for the Proposed Project will be AFFIRMED.
Procedural History.
 Substantial portions of the pre-hearing procedural history are set forth in the Agreed-Upon Findings of Fact and are not included here. Glynn's application with the City of Boston Inspectional Services Department ("ISD") for a building permit was denied as a matter of course because the property was within the GCOD. ZBA held a hearing on Glynn's appeal on September 23, 2014 (the "ZBA Hearing"). Agreed Fact ¶6; Exhibit 5. At the conclusion of the hearing, ZBA voted to grant Glynn a CUP for the Proposed Project. Hearing Transcript ("TR") 52:19-22. ZBA issued its written decision (the "ZBA Decision") on December 3, 2014, and Perry timely appealed.
 In accordance with Boston Zoning Enabling Act § 11, this Court conducted a de novo evidentiary hearing, which was held in May 2019, and included five witnesses and 32 exhibits. On August 9, 2019, the parties filed a joint pleading with 46 agreed-upon findings of fact (Docket # 60). Each party also filed a pleading with additional disputed findings of fact and proposed rulings of law (Docket # 59, 61-63). On September 10, 2019, the Court issued a Procedural Order setting forth an additional 26 proposed Findings of Fact, based on the post-trial submission of the parties, and further requesting that the parties each submit a letter by October 2, 2019 addressing (1) whether any evidence admitted at trial casts substantial doubt on the validity of any of the 26
 -3-
additional proposed Findings of Fact, and (2) whether the party believes that any further Findings of Fact are necessary or highly significant for a ruling in favor of the proponent of the further proposed Finding of Fact. On October 2, 2019, Perry submitted a letter questioning nine of the Court's 26 additional proposed Findings of Fact and listing 78 of its previously identified 90 disputed findings of fact (essentially all of PeiTy's proposed disputed findings not adopted by the Court) as necessary or highly significant for a ruling in his favor, with cites to the record. Glynn submitted a letter explaining his concerns about five of the Court's 26 additional proposed Findings of Fact.
 The Court heard closing arguments on November 18, 2019.
Agreed-Upon Findings of Fact 
 1. Perry has owned 323-327 Newbury Street, Boston, MA (the "Perry Property"), which directly abuts the properties known as 45-53 Hereford Street, Boston, MA ("Hereford Street Properties") since 1968. Pre-trial Conference Memorandum dated February 13, 2019 ("PTC Agreed Fact") at ¶1; Trial Transcript ("TR") 737:20-24; 780:1- 3.
 2. On April 2, 2014, Glynn filed an application with ISD for a building permit for the restoration and refurbishment of 45, 47 and 49 Hereford Street (with existing 18 residential units), and construction of a retail and office building addition to be attached to the existing buildings on lots 51 and 53 Hereford Street (the "Proposed Project or the "project"). PTC Agreed Fact ¶2; TR 13:6-18; Exhibits 2, 5, 6.
 3. The Proposed Project is located within the GCOD. TR 15:21-24; Exhibit 1 at Boston Zoning Code Article 32, § 32-1.
 -4-
 4. ISD denied Glynn's application by letter dated April 14, 2014 ("Zoning Code Refusal letter"), indicating that the Proposed Project was located in the GCOD under Article 32, § 32-4 of the Boston Zoning Ordinance. PTC Agreed Fact ¶3; Exhibit 2.
 5. An application for a building permit within the GCOD is automatically denied by the ISD. TR 346:23 — 347:8.
 6. On April 18, 2014 Glynn appealed ISD's denial of the building permit to the ZBA. PTC Agreed Fact ¶ 4; Exhibits 2, 5.
 7. The ZBA scheduled a hearing on Glynn's appeal for September 23, 2014. PTC Agreed Fact 41[ 6; Exhibit 5.
 8. The ZBA held a hearing on Glynn's appeal on September 23, 2014 (the "ZBA Hearing"). PTC Agreed Fact ¶ 6; Exhibit 5.
 9. Defendants, Robert Shortsleeve, Christine Araujo, Anthony Pisani, Mark Fortune, Bruce Bickerstaff, Peter Chin and Mark Ehrlich, are all or were duly appointed members or alternates of the Zoning Board of Appeals of the City of Boston, Suffolk County, Massachusetts. PTC Agreed Fact ¶7.
 10. Perry's attorney, Neal Glick ("Attorney Glick"), attended the ZBA Hearing on Perry's behalf. TR 787, Perry Direct.
 11. At the conclusion of the hearing, the ZBA voted to grant Glynn a CUP for the Proposed Project. TR 52:19-22.
 12. The ZBA issued its written Decision on December 3, 2014. Exhibit 5.
 13. Perry timely appealed the ZBA's Decision.
 14. Boston City Base is 5.65 feet below mean sea level. TR 337:14-24; 338:1-10.
 -5-
 15. One of the stated purposes of Code Article 32 is to prevent deterioration of and, when necessary, promote the restoration of groundwater levels in the City of Boston. TR 69:12-17; Exhibit 1 at Boston Zoning Code Article 32, § 32-1.
 16. One purpose of the GCOD is to protect and enhance the City's historic neighborhoods. TR 495:11-14.
 17. One purpose of the GCOD is to reduce surface runoff. TR 495:15-17.
 18. One purpose of the GCOD is to maintain public safety. TR 496:2-4.
 19. The purpose of the overlay district is to assist in the maintenance of the groundwater levels in the land-filled areas of Boston. TR 22:2-13.
 20. The city decided to require the installation of a recharge system to take rainwater that lands on the site and distribute it back into the ground to remedy the effects of the essentially complete paving of these areas, which inhibits groundwater from reentering the water table. TR 22:14-24.
 21. Rotting piles could lead to settlement of a building in the Back Bay. TR 282:13-20; 627:6-11.
 22. Wood pilings must be submerged at all times to prevent them from rotting due to exposure to air. TR 22:2-13; 282:13-15.
 23. According to Joel E. Breuer ("Breuer"), called as an expert witness by the Defendants, the three elements are the standards found in Article 32, § 32-6:
 24. The system has to be an appropriately designed system so it is properly engineered.
 25. There needs to be a volume that is set in the standard — the one inch of rainwater over the area of the proposed project.
 -6-
 26. There needs to be a consideration of whether the proposed project itself does not negatively impact the groundwater at the site or adjacent sites. TR 396:23 — 397:17.
 27. The standards in Article 32, § 32-6, are essentially instructions to an engineer as to what is required for a stormwater infiltration system under GCOD. TR 397:3-6.
 28. Article 32 was written in such a way that it was very simplistic and easy to implement. TR 479:21-23.
 29. There is a difference between capturing one inch of rainfall over the lot versus the capacity to capture one inch of rainfall over the lot. TR 507:20-24; 508:1-10.
 30. You must have both capture and capacity to comply with Article 32. TR 508:11-16.
 31. H.W. Moore Associates, Inc. ("H.W. Moore"), was retained in 2012 to assist with the design of the stormwater infiltration system that was submitted to the ZBA in 2014 for the Proposed Project (the "2014 system"). TR 283:16-20.
 32. Harold W. Moore, a professional engineer at H.W. Moore, provided a "no harm" letter dated September 22, 2014 to the ZBA certifying that the 2014 Proposed Project's storm water infiltration system complies with the GCOD requirements under Code Article 32, and specifically that the system was designed with a storage volume in excess of the required 1.0 inch over the area of the site. TR 157:15-19; Exhibit 4.
 33. The Boston Water and Sewer Commission ("BWSC") approved H.W. Moore's 2014 Utility Site Plan design indicating that the plan complied with Code Article 32.
TR 36:5-9; 90:21 — 91:5; 154:17 — 155:8; Exhibit 3; Exhibit 6.
 34. A storm water infiltration system design is always site specific. TR 286:4-7.
 -7-
 35. It is important that a storm water infiltration system take into account the unique features of the location. TR 475:2-5.
 36. It is good engineering practice to provide for overflow of the stormwater infiltration system. TR 698:7-20.
 37. The open space between the Hereford Street buildings and Peny's building was paved at the time H.W. Moore began working on the Proposed Project. TR 162:816.
 38. At the time the 2014 system was designed, the Hereford Street Properties had no storm water infiltration system; it just connected directly to the combined sewer in public alley 430. TR 159:14 — 160:1; 160:10-14.
 39. At the time the Proposed Project was first designed, the Hereford Street Properties rear yards had a pair of catch basins to collect the storm water runoff from the pavement, which carried the water directly into the combined sewer in public alley 430. TR 162:8-16.
 40. H.W. Moore prepared the 2014 system design based on 10,108 square feet, which is the entirety of the property encompassed by 45-53 Hereford Street. TR 148:19-23 — 149:1-5; 287:19 — 288:2; 680:8-15.
 41. H.W. Moore assumed, when designing the 2014 system, that the Hereford Street Properties located in the Back Bay were built upon pilings. TR 283:1-11.
 42. H.W. Moore prepared the site grading and utility plan and submitted it to the BWSC with other required documentation for approval by BWSC, which comments and sends the plans back for changes. TR 152:10-18; 153:11-24 — 154:1-8.
 -8-
 43. The 2014 system design consisted of a grid of four-inch perforated pipe set in a bed of crushed stone. TR 147:2-10; 222:21 — 223:7; Exhibit 6.
 44. The volume capacity of the 2014 system exceeded the one-inch volume requirement and was calculated correctly. TR 147:2-10; 647:23 — 648:19; Exhibit 6.
 45. The 2014 system design allowed water to fill the pipe before flowing into the combined sewer system located in public alley 430. TR 156:2-20; 290:18-23; Exhibit 6.
 46. The 2014 system design included area inlet drains on (1) the west side of the Hereford Street Properties, which is between the Perry building and the proposed building located approximately a third of the way between Newbury Street and public alley 430; (2) the north corner of the proposed building; and (3) between the existing buildings at 45-53 Hereford Street and the proposed building. TR 170:2 — 171:11.
 47. The intent of the area inlet drains was to capture the surface water and tie it into the storm water infiltration system. TR 171:9-11.
 48. The area drains and pipes that connect the area drains to the system are part of the storm water infiltration system. TR 516:4-18.
 49. The 2014 system design did not tie the existing downspouts at the front of the Hereford Street buildings into the infiltration system. TR 320:12-18; Exhibit 6. Additional Factual Findings 
 50. The Hereford Street Properties' rear yards to the east of the wall of 323-327 Newbury Street consisted of green space and trees until at least 1996. TR 742:12 — 743:21; Exhibit 24.
 -9-
 51. The trees and green space to the east of the wall of 323-327 Newbury Street were removed in 1996, allowing vehicles to park on the Hereford Street Properties' rear yards for the first time. TR 746:2 — 748:4; Exhibit 25.
 52. In May 2006, the Hereford Street Properties' rear yards were paved. TR 748:16 — 749:3; 750:2-20; Exhibit 26.
 53. In September 2010, ISD issued violations to Glynn for paving over the Hereford Street Properties' rear yards without a permit. TR 772:9 — 773:2; Exhibit 29.
 54. In August 2014, Glynn was cited by BWSC for violations regarding catch basins installed in the subsurface in the Hereford Street Properties' rear yards. TR 764:19 — 765:17; Exhibit 27.
 55. Perry did not attend the ZBA Hearing, he was represented by Attorney Glick. TR 781:10-15; 787:2-11; Exhibit 12.
 56. The ZBA did not let Attorney Glick comment on, raise objections or otherwise oppose the issuance of a CUP to Glynn. TR 787:11-13; Exhibit 12.
 57. City Councilor Josh Zakim and representatives of City Councilors Stephen Murphy, Ayanna Pressley and Michael Flaherty requested deferrals on the issuance of a CUP to Glynn, citing resident concerns and lack of notice issues. Exhibit 12.
 58. In approving a CUP for the Proposed Project, ZBA found that the elements for approval in Article 32, § 32-6 had been met, based solely upon the BWSC's approval in that ZBA did not consider additional evidence. Exhibit 12.
 59. After issuance of the CUP in 2014, the Proposed Project was modified after review by the Back Bay Architectural Commission ("BBAC"), which granted a
 -10-
Certificate of Appropriateness for the Project. TR 14:9 — 15:20; 31:3 — 32:11; 33:2-24; Exhibits 6, 9.
 60. After issuance of the CUP in September 2014, changes were made to the stormwater infiltration system for the Proposed Project. TR 33:18-24.
 61. The 2017 modified design of the infiltration system is similar in numerous respects to the 2014 design, and it is roughly the same size on the same footprint. TR 33:2-24; 126:20 — 127:5.
 62. The capacity of the infiltration system is based on the site area. The system is required by Article 32 to provide a minimum storage volume of 842.3 cubic feet ("cf'), for the Project site (10,108 sf x 1/12 ft. = 842.3cf). The project area in which renovations and construction occurred, 8,014 square feet, is approximately 20% less than that. TR 247:13-19; 397:24 — 398:14; Exhibit 17.
 63. Modifications to the 2014 design for the 2017 infiltration system included relocating it, making it easier than under the previous design to clean and maintain, the use of leaching galleys in a crushed stone bed instead of perforated pipe, and other changes that did not adversely affect the system's design or operation. TR 33:18-24, 166:24 — 169:16; 224:2-11; 225:9 — 226:11; Exhibit 9. 
 64. BWSC issued a letter to Glynn dated August 4, 2017, confirming that the redesigned project's site plan "meets the requirements as set forth in the Groundwater [3]verlay District Requirements." Exhibit 11.
---------------------------
 
[3] The Boston Groundwater Trust is a non-profit organization that, inter alia, provides information on groundwater levels to City of Boston agencies. Its trustees are special municipal employees. See www.bostongroundwater.org.
 -11-
 65. The 2014 no harm letter and 2017 no harm letter are certifications by a professional engineer, H.W. Moore, that the proposed project and associated stormwater infiltration system comply with Article 32. TR 157:15-24; 244:5 — 246:11; Exhibits 4 and 10.
 66. The groundwater well by the Boston Groundwater Trust located on the Perry Property adjacent to the alley behind the Perry building is the closest well to both properties; from the data obtained from the well the average groundwater height adjacent to Perry's building over the past 10 years averaged at 5.55 feet; the piles under the Perry building average at 5 feet. The average groundwater height adjacent to the building on Perry's property was higher than the average height of his piles. TR 402:20-24; 404:8-24; 405:13-19; 406:1-5; 472:8-24.
 67. Guy Grassi, a licensed architect in Boston for over 35 years who was the architect for the Proposed Project, credibly testified that:
 
No one recharge system can maintain the groundwater level. No one building, I believe, can affect or can raise or lower the groundwater level all by itself. Groundwater moves sideways. It flows. And there are all kinds of complications that occur underground that prevent groundwater from moving and prevent it from entering. TR 7:11 — 8:13; 70:21 — 71:4.
 68. Joel Breuer, a licensed engineer with over 30 years of experience in civil engineering and construction, who testified for Glynn, agreed on cross-examination that it has been an engineering best practice, before and after GCOD, to ensure that construction projects do not have any adverse effects on groundwater levels on the site of the project and adjacent lots. TR 326:1 — 327:9; 458:8-15.
 -12-
 69. Mark Bartlett, a licensed professional engineer for over 35 years, credibly testified that soil conditions, sewer lines and other factors can affect groundwater flow. TR 611:5 — 612:18; 639:16-22; 704:13-17.
 70. Frederick Keylor, a project manager at H.W. Moore Associates who has worked there for more than 35 years, credibly testified to his understanding of compliance with the BWSC and ZBA approval process as follows:
 
We don't do any investigation of the surrounding properties. We comply with the requirements of the Article 32. And it's presumed that if you're complying with the requirements of Article 32, you're helping to restore groundwater. And by restoring groundwater, you're benefiting the neighborhood. TR 144:17 — 145:21; 302:9-16.
 71. Based on all the above-noted evidence, including but not limited to the testimony of Guy Grassi, Joel Breuer, Mark Bartlett, and Frederick Keylor, the Proposed Project will not have any negative impact on groundwater levels on the Perry Property.
RULINGS OF LAW
 
A. Standard of Review and Burden of Proof
 There is no dispute as to most of the legal principles that govern this proceeding. Under the Boston Zoning Enabling Act, § 11, this Court conducts a de novo review of the ZBA decision. Lynch v. Board of Appeal of Boston, 1 Mass. App. Ct. 353, 358 (1973). This proceeding involves the issuance of a special permit, which is distinguished from an as-of-right permit in that it is subject to discretionary review by the relevant permit granting authority. Duteau v. Zoning Board of Appeals of Webster, 47 Mass. App. Ct. 664, 667 (1999). ZBA has considerable discretion to grant or deny a permit; its decision "cannot be disturbed unless it is based on a legally untenable ground, or is unreasonable,
 -13-
whimsical, capricious or arbitrary." MacGibbon v. Board of Appeals of Duxbury, 356 Mass. 635, 639 (1970). The Court can consider evidence available to ZBA that was not considered by ZBA. See Bicknell Realty v. Board of Appeal of Boston, 330 Mass. 676, 679 (1953).
 As an abutting landowner, Perry has presumptive standing, which Glynn has not contested, to challenge the ZBA Decision. Marashlian v. Zoning Board of Appeals of Newburyport, 421 Mass. 719, 721 (1996). Glynn has the burden of demonstrating that the zoning decision was justified. Martin v. Board of Appeals of Yarmouth, 20 Mass. App. Ct. 972, 972 (1985).
 B. The ZBA Decision Should be Affirmed 
 In granting a permit for the Proposed Project, ZBA found that all conditions required for the granting of a permit under Article 32, § 32-6 had been met. Exhibit 5. The parties to this case describe these conditions as three elements: (1) the system has to be appropriately designed so that it is properly engineered; (2) there needs to be a volume that is set in the standard — one inch of rainwater over the surface area of the site of the proposed project; and (3) the proposed project must not negatively impact groundwater at the site of the project or adjacent lots. SOF 24-26; TR 396:23 — 397:17. Article 32, § 326 puts these three conditions into two subparagraphs, as follows: (1) promoting infiltration of rainwater into the ground by capturing the requisite volume of rainfall (1 inch of rainwater over the area of the Proposed Project) within a suitably-designed system, Article 32, § 32-6(a); and (2) the absence of a negative impact on groundwater levels within the lot in question and adjacent lots, Article 32, § 32-6(b).
 -14-
 This Court has no trouble concluding that ZBA had a strong basis to conclude that the rainwater infiltration system for the Proposed Project satisfied the appropriate design and sufficient capacity elements of Article 32, § 32-6, in that the system was designed by a professional engineer, and was designed to capture and could capture and recharge into the groundwater at least one inch of rainwater over the surface area of the site of the Proposed Project. However, the finding that the Proposed Project did not negatively impact groundwater levels at the project site or adjacent lots requires further scrutiny, because neither BWSC nor ZBA made any separate assessment of this element. Moreover, the lack of a separate assessment of this element directly dovetails with ZBA's decision not to give Perry's lawyer an opportunity to address ZBA at the September 23, 2014 hearing. If ZBA lawfully can issue CUPs based solely on the certification of a licensed engineer that the system has been appropriately designed and can capture sufficient rainwater, there was no prejudice in ZBA's decision not to hear from Perry's counsel on the impact of the Proposed Project on Perry and other abutting landowners. On the other hand, if ZBA was required separately to assess the impact of the Proposed Project on abutting landowners, then ZBA compounded its violation of Article 32 by not allowing Perry's lawyer to address the issue.
 This Court finds that, at least under the circumstances of this case and perhaps under any circumstances, ZBA's interpretation of Article 32, §32-6 is not only legally tenable, but the most reasonable interpretation of that provision. Statutes must be construed "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main
 -15-
object to be accomplished." Grady v. Zoning Board of Appeals of Peabody, 465 Mass. 725, 729 (2013) (internal quotation omitted). More specifically with regard to zoning laws, a "zoning by-law should be construed sensibly, with regard to its underlying purposes, and, if possible, as a harmonious whole." Miles-Matthias v. Zoning Board of Appeals of Seekonk, 84 Mass. App. Ct. 778, 787-788 (2014) (internal quotation omitted). The overriding purpose of Article 32, as explicitly stated therein, is to maintain groundwater levels in the City of Boston. Article 32, §§ 32-1, et. seq.. This is a community purpose. Nothing suggests that, in enacting Article 32, the City intended to give new powers regarding maintenance of groundwater levels to individual landowners who happen to live adjacent to new construction projects. Moreover, construing the bylaw to require an individual assessment of the effect of each new project on groundwater levels on adjacent lots would be largely or entirely an exercise in futility. As Guy Grassi, a licensed architect in Boston for over 35 years, credibly testified:
 
No one recharge system can maintain the groundwater level. No one building, I believe, can affect or can raise or lower the groundwater level all by itself. Groundwater moves sideways. It flows. And there are all kinds of complications that occur underground that prevent groundwater from moving and prevent it from entering.
See supra at 12. In other words, the only way to maintain adequate groundwater levels across the GCOD is to require a large number of stormwater infiltration systems (the City has required one such system for each significant construction project), each of which captures a sufficient amount of stormwater such that the overall effect of these systems is beneficial to groundwater levels. As Frederick Keylor, a veteran project manager at H.W. Moore Associates, credibly and candidly explained:
 
We don't do any investigation of the surrounding properties. We comply with the requirements of the Article 32. And it's presumed that if
 -16-
 
you're complying with the requirements of Article 32, you're helping to restore groundwater. And by restoring groundwater, you're benefiting the neighborhood. TR 302:9-16.
See supra at 13.
 Putting this in legal terms, ZBA reasonably interprets Article 32, §32-6 to provide that by satisfying the appropriate design and sufficient capacity conditions of Article §32-6(a), the applicant is presumed to have satisfied the no harm to groundwater levels condition of Article §32-6(b), a presumption that factually may be irrebuttable.
 At the hearing, Perry established that soil conditions, sewer lines and other factors can affect groundwater flow. See supra at 12. However, the fact that soil and structures can impact groundwaterflow does not mean that ZBA should interpret Article 32 to require a separate assessment of the effects of proposed projects on groundwater levels on adjacent lots, when groundwater levels will be determined overwhelmingly or entirely by other factors.
 This Court does not categorically rule out the possibility that, under highly unusual circumstances, ZBA might be required to make a separate assessment of the effect of a stormwater infiltration system on groundwater levels on adjacent properties. Ideally, ZBA should at least have ascertained whether Perry's attorney had evidence that this was an extraordinary situation in which a proposed project could have a negative impact on groundwater levels on adjacent lots, notwithstanding construction of an appropriately designed stormwater infiltration system with sufficient capacity. However, there is no reason to remand this case to ZBA. Perry had the opportunity at the de novo hearing before this Court to
 -17-
prove that the Proposed Project would have a negative impact on groundwater levels on the Perry Property, and he did not prove it. Indeed, based on the evidence credited by the Court in this case, the Court questions whether an adjacent landowner could ever make such a showing.
 Perry's other arguments can be resolved in summary manner. His due process and statutory rights to a hearing were satisfied by the May 2019 de novo hearing before this Court. In light of this Court's interpretation of Article 32, Perry's alleged observations of damages to the structures on his property, the history of paving and construction on the Hereford Street Properties, and prior citations issued against Glynn were not relevant to ZBA's decision. Post-approval changes to the stormwater infiltration system corrected an earlier, minor miscalculation about the capacity of the system, improved the system on balance, and were approved by BWSC in an August 4, 2017 letter to Glynn confirming that the redesigned project's site plan "meets the requirements as set forth in the Groundwater Overlay District Requirements." Perry's arguments that "surface area" for purposes of system capacity means something other than the surface area of the site of the Proposed Project, and that all rainwater falling into the Proposed Project's structures must be captured by the system, have no support in either the language or any logical interpretation of Article 32. None of these circumstances comes anywhere close to rendering the ZBA Decision "legally untenable...or...unreasonable, whimsical, capricious or arbitrary." MacGibbon v. Board of Appeals of Duxbury, 356 Mass. at 639.
CONCLUSION AND ORDER
 -18-
 For the above reasons, the ZBA Decision is AFFIRMED.
@Robert L. Ullmann Justice of the Superior Court
@December 2019
 -19-
xxz